**No. 19-16913, 19-17024**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

VINCENT SICRE DE FONTBRUNE; LOAN SICRE DE FONTBRUNE;
ADELE SICRE DE FONTBRUNE; ANAIS SICRE DE FONTBRUNE, IN
THEIR CAPACITY AS THE PERSONAL REPRESENTATIVES OF THE
ESTATE OF YVES SICRE DE FONTBRUNE,

*Plaintiffs-Appellants/Cross-Appellees*,

v.

ALAN WOFSY and ALAN WOFSY & ASSOCIATES,

*Defendants-Appellees/Cross-Appellants*.

On Appeal from the United States District Court
for the Northern District of California
Case No. 5:13-cv-05957-EJD
Hon. Edward J. Davila

**BRIEF OF *AMICI CURIAE* AUTHORS ALLIANCE, ELECTRONIC
FRONTIER FOUNDATION, PROJECT GUTENBERG LITERARY
ARCHIVE FOUNDATION, AND PUBLIC KNOWLEDGE IN SUPPORT
OF THE PETITION FOR PANEL REHEARING AND REHEARING EN
BANC**

Corynne McSherry
Mitchell L. Stoltz
**ELECTRONIC FRONTIER FOUNDATION**
815 Eddy Street
San Francisco, CA 94109

David Hansen
Rachel Brooke
**AUTHORS ALLIANCE**
2705 Webster St., #5805
Berkeley, CA 94705

John Bergmayer
**PUBLIC KNOWLEDGE**
1818 N Street NW, Suite 410
Washington, D.C. 20036

James R. Batchelder
**ROPES & GRAY LLP**
1900 University Avenue, 6th Floor
East Palo Alto, CA 94303

Kathryn C. Thornton (*counsel of
record*)
**ROPES & GRAY LLP**
2099 Pennsylvania Avenue NW
Washington, D.C. 20006
(202)-508-4724
kathryn.thornton@ropesgray.com

Evan Gourvitz
**ROPES & GRAY LLP**
21211 Avenue of the Americas
New York, N.Y. 10036

*Counsel for Amici Curiae*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amici curiae* state that they are nonprofit organizations, with no parent corporations or publicly traded stock, and with no publicly-held company holding 10% or greater ownership.

**CONSENT FOR BRIEF OF AMICI CURIAE**

Pursuant to Federal Rule of Appellate Procedure 29(a) and Circuit Rule 29-3, amici state that they have obtained consent from Plaintiffs-Appellants and Defendants-Appellees to file this brief.

# TABLE OF CONTENTS

**Page**

INTEREST OF *AMICI CURIAE* ..............................................................................1

ARGUMENT ......................................................................................................3

I.      This Cases Merits Rehearing Because It Raises Exceptionally Important Questions about the Scope of First Amendment Rights Affecting Millions of American Authors and Members of the Public ...............................................4

II.     This Cases Also Merits Rehearing Because the Panel's Fair Use Analysis Contained Significant Errors ...........................................................................6

       A.     The Court Failed to Consider Constitutional Limits on Copyright Protection When Assessing the Nature of the Asserted Works ...........6

       B.     The Court Failed to Consider First Amendment Principles When Assessing the Purpose and Character of the Appellee's Use .............11

       C.     Fair Use Analysis Provides a Pivotal Safeguard for Protected Speech Against Foreign Copyright Judgments Repugnant to U.S. Public Policy ........................................................................................15

CONCLUSION ...................................................................................................16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABS Ent., Inc. v. CBS Corp.*,
   908 F.3d 405 (9th Cir. 2018) ...............................................................................8, 9

*Am. Soc. for Testing & Materials v. Public.Resource.Org, Inc.*,
   896 F.3d 437 (D.C. Cir. 2018) ...............................................................................8

*ATC Distrib. Grp., Inc. v. Whatever It Takes Transmissions & Parts,
   Inc.*, 402 F.3d 700 (6th Cir. 2005) .........................................................................9

*Bridgeman Art Lib., Ltd. v. Corel Corp.*,
   36 F. Supp. 2d 191 (S.D.N.Y. 1999) ......................................................................9

*Campbell v. Acuff-Rose Music, Inc.*,
   510 U.S. 569 (1994) ................................................................................................8

*Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*,
   109 F.3d 1394 (9th Cir. 1997) ................................................................................7

*Eldred v. Ashcroft*,
   537 U.S. 186 (2003) ................................................................................................5

*Georgia v. Public.Resource.Org, Inc.*,
   140 S. Ct. 1498 (2020) ............................................................................................5

*Golan v. Holder*,
   565 U.S. 302 (2012) ..........................................................................................5, 15

*Google LLC v. Oracle Am., Inc.*,
   141 S. Ct. 1183 (2021) ............................................................................9, 11, 12, 13

*Harper & Row Publishers, Inc. v. Nation Enters.*,
   471 U.S. 539 (1985) ................................................................................................7

*Kelly v. Arriba Soft Corp.*,
   336 F.3d 811 (9th Cir. 2003) ................................................................................13

*McGucken v. Pub Ocean Ltd.*,
   No. 21-55854, 2022 WL 3051019, slip op. (9th Cir. 2022) ..................................9

*Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.*,
   528 F.3d 1258 (10th Cir. 2008) ......................................................................10

*Naoko Ohno v. Yuko Yasuma*,
   723 F.3d 984 (9th Cir. 2013) ...........................................................................6

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007) ...................................................................13, 14

*S.A.R.L. Louis Feraud Int'l v. Viewfinder, Inc.*,
   489 F.3d 474 (2d Cir. 2007) ...........................................................................15

*Sega Enters. Ltd. v. Accolade, Inc.*,
   977 F.2d 1510 (9th Cir. 1992) ........................................................................13

*Sicre de Fontbrune v. Wofsy*,
   39 F.4th 1214 (9th Cir. 2022) ..................................................................*passim*

*Yahoo!, Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme*,
   169 F. Supp. 2d 1181 (N.D. Cal. 2001), *rev'd on jurisdictional
   grounds*, 433 F.3d 1199 (9th Cir. 2006) ............................................................6

**Statutes**

17 U.S.C. § 107 ....................................................................................................4

ALASKA STAT. § 09.30.110 ...................................................................................3

ARIZ. REV. STAT. ANN. §§ 12-3251 – 12-3254 ......................................................3

California Uniform Foreign-Country Money Judgment Recognition
   Act., CAL. CIV. PROC. CODE §§ 1713-1725 ....................................................3

HAW. REV. STAT. § 658F ......................................................................................3

IDAHO CODE §§ 10-1401 – 10-1411 .....................................................................3

MONT. CODE ANN. §§ 29-5-601 – 29-5-612 .........................................................3

NEV. REV. STAT. §§ 17.700 – 17.820 ....................................................................3

OR. REV. STAT. §§ 24.350 – 24.400 .....................................................................3

WASH. REV. CODE § 6.40A ..................................................................................3

v

**Other Authorities**

COLLEGE ART ASSOCIATION, CODE OF BEST PRACTICES
    IN FAIR USE FOR THE VISUAL ARTS 9 (2015),
    https://www.collegeart.org/pdf/fair-use/best-practices-fair-use-
    visual-arts.pdf ........................................................................................12

Art Institute of Chicago, *Pierrot and Harlequin,*
    *https://www.artic.edu/artworks/61867/pierrot-and-harlequin* ...........................10

Jane C. Ginsburg, *A Tale of Two Copyrights: Literary Property in
    Revolutionary France and America* .......................................................................4

Matthew Sag, *The Prehistory of Fair Use*, 76 BROOK. L. REV. 1371
    (2011) .........................................................................................................4

Michael Birnhack, *Copyrighting Speech: A Trans-Atlantic View* in
    COPYRIGHT AND HUMAN RIGHTS - FREEDOM OF
    EXPRESSION - INTELLECTUAL PROPERTY - PRIVACY, 37-
    62, (Paul L.C. Torremans, ed., Kluwer Law International, 2004) ........................4

## INTEREST OF *AMICI CURIAE*[1]

Authors' Alliance is a 501(c)(3) nonprofit that seeks to advance the interests of authors who want to serve the public good by sharing their creations broadly. Authors Alliance has over 2,300 members, including academic authors, novelists, narrative nonfiction authors, journalists, and other authors who share its mission. Its Advisory Board includes two Nobel Laureates, a Poet Laureate of the United States, three MacArthur Fellows, and distinguished professors from leading institutions from across the United States.

Its members (and many other authors) rely heavily on fair use to exercise their First Amendment rights. Authors Alliance has a strong interest in both protecting those rights within the U.S. from encroachment abroad, and ensuring that U.S. courts afford those who rely on fair use a thorough, adequate assessment of their use based on the specific facts of their case.

The Electronic Frontier Foundation ("EFF") is a San Francisco-based, member-supported, nonprofit civil liberties organization that has worked for over thirty years to protect fundamental rights in the digital world. With tens of thousands of dues-paying members, EFF represents the interests of technology users in court cases and policy debates regarding the application of law to digital

---

[1] No counsel for any party authored this brief in whole or in part, and no person or entity, other than *amici curiae* or their counsel, made a monetary contribution intended to fund the preparation or submission of this brief.

technologies. EFF, its members, and the broader community of technology users they represent have a strong interest in a copyright system that promotes progress by safeguarding freedom of expression for all who participate in making, sharing, and learning about creative work.

The Project Gutenberg Literary Archive Foundation ("Project Gutenberg") is an American nonprofit library that makes literary works available for free online once they enter the U.S. public domain. Project Gutenberg's volunteers have digitized 60,000 books since 1971, making its digital library the oldest in the world. Project Gutenberg relies on fair use and the constitutional limitations to U.S. copyright law to benefit the public, allowing Americans to easily read, search, and otherwise digitally interact with public domain works. Being forced to comply with foreign copyright regimes that do not include these important protections of the public sphere and interest would seriously threaten Project Gutenberg's ability both to serve the American public in this way and to operate on the Internet.

Public Knowledge is a nonprofit organization that is dedicated to preserving the openness of the Internet and the public's access to knowledge, promoting creativity through balanced intellectual property rights, and upholding the rights of consumers to use innovative technology lawfully. Public Knowledge advocates on behalf of the public interest for a balanced copyright system, particularly with respect to new and emerging technologies.

**ARGUMENT**

This case is of exceptional importance. It asks the court to evaluate the significance of fair use as a matter of U.S public policy (including its intersection with First Amendment rights) and to decide whether fair use will continue to be protected in the face of contrary foreign judgments. Almost no judicial opinions address this issue, and the resolution of this case will have a ripple effect on countless U.S. authors, libraries, and members of the public who rely on fair use to protect their right to use third-party works. The scope of fair use and free speech rights are particularly important when the laws of other, more restrictive, jurisdictions are implicated, an increasingly common occurrence given the ease with which the Internet allows for global distribution.

This case arose amidst a series of other complex procedural claims under the California Uniform Foreign-Country Money Judgment Recognition Act., CAL. CIV. PROC. CODE §§ 1713-1725.[2] However, that complexity should not mean that important federal public policy considerations regarding fair use receive only abbreviated attention, which is all that the panel's decision provided. The panel erred by not aligning its fair use analysis with the First Amendment and

---

[2] Though this case arises under California law, every state within this Court's jurisdiction has a substantially similar state law. *See* ALASKA STAT. § 09.30.110; ARIZ. REV. STAT. ANN. §§ 12-3251 – 12-3254; HAW. REV. STAT. § 658F; IDAHO CODE §§ 10-1401 – 10-1411; MONT. CODE ANN. §§ 29-5-601 – 29-5-612; NEV. REV. STAT. §§ 17.700 – 17.820; OR. REV. STAT. §§ 24.350 – 24.400; WASH. REV. CODE § 6.40A. Given the lack of precedent in those jurisdictions on this issue, the panel's decision carries strong persuasive weight for how authors and others in those jurisdictions will understand the scope of their rights.

3

constitutional limits on copyright. Rehearing will provide needed precedent and guidance for U.S. authors, Internet users, and members of the public seeking to creatively make use of copyrighted third-party works.

**I.    This Cases Merits Rehearing Because It Raises Exceptionally Important Questions about the Scope of First Amendment Rights Affecting Millions of American Authors and Members of the Public**

Fair use is a distinctive feature of US law and public policy that supports the use of copyrighted third-party works for a broad array of purposes, including criticism, comment, education, research, and scholarship, without authorization from the rightsholder. 17 U.S.C. § 107. These rights are a special feature of U.S. law and public policy, tracing back hundreds of years to early English common law. *See* Matthew Sag, *The Prehistory of Fair Use*, 76 BROOK. L. REV. 1371 (2011). Most countries—including France—do not include such robust protections for free speech in the context of copyrighted works, or any fair use analog at all. *See* Michael Birnhack, *Copyrighting Speech: A Trans-Atlantic View*, in COPYRIGHT AND HUMAN RIGHTS - FREEDOM OF EXPRESSION - INTELLECTUAL PROPERTY - PRIVACY, 37-62, (Paul L.C. Torremans, ed., Kluwer Law International, 2004) (contrasting U.S. and European approaches); Jane C. Ginsburg, *A Tale of Two Copyrights: Literary Property in Revolutionary France and America*, 64 Tulane L. Rev. 991 (1990) ("The French and U.S. copyright systems are well known as opposites.").

4

The U.S. fair use doctrine is particularly distinct because it is the primary tool by which copyright law accommodates the equally distinctive and strong free speech rights that Americans enjoy, as embodied in the First Amendment. The Supreme Court has repeatedly emphasized that fair use is a constitutional necessity, explaining: "First Amendment protections are 'embodied . . . ' in the 'latitude for scholarship and comment' safeguarded by the fair use defense." *Golan v. Holder*, 565 U.S. 302, 328 (2012), and that fair use is "designed to accommodate First Amendment concerns[.]" *Georgia v. Public.Resource.Org, Inc.*, 140 S. Ct. 1498, 1513 (2020); *see also Eldred v. Ashcroft*, 537 U.S. 186, 219-220 (2003).

In practice, constitutionally-protected speech supported by fair use is woven into Americans' daily lives. Authors rely on fair use to quote, criticize, and comment on the work of others, and to distribute their reflections via ebooks, audiobooks, blogs, and other digital formats. Internet users rely on fair use to participate in public discourse through social media. Libraries rely on fair use to share their materials with the world to help inform and educate.

Indeed, because online speech is effectively global speech, U.S. courts must vigorously protect the right to engage in online speech that is safeguarded by the Constitution and permissible under U.S. copyright law. This protection must include protection from foreign copyright judgments that are repugnant to bedrock principles of U.S. law, including fair use law, and that—if enforced by U.S.

5

courts—would strip American authors and the public of their First Amendment rights.

This Court previously has recognized the challenges associated with enforcement of foreign judgments that run afoul of the First Amendment, particularly when those foreign judgments are based on "fundamental differences in the guiding legal doctrine." *Naoko Ohno v. Yuko Yasuma*, 723 F.3d 984, 1005 (9th Cir. 2013) (describing with approval the analysis of Northern District of California in declining to enforce a French judgment that restricted distribution of Nazi-related content in *Yahoo!, Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme*, 169 F. Supp. 2d 1181, 1184 (N.D. Cal. 2001), *rev'd on jurisdictional grounds*, 433 F.3d 1199 (9th Cir. 2006)). French and American approaches to copyright law and fair use represent precisely such a "fundamental difference[]." This case offers the opportunity to clarify for millions of Americans that such a fundamentally different foreign copyright regime will not be used to erode their core First Amendment rights to free speech.

## II. This Cases Also Merits Rehearing Because the Panel's Fair Use Analysis Contained Significant Errors

### A. The Court Failed to Consider Constitutional Limits on Copyright Protection When Assessing the Nature of the Asserted Works

The panel also erred when it determined that the second factor weighed against fair use, curtailing its analysis on the creativity of the photographs from the

Zervos Catalogue (the "Zervos Photographs"). This second fair use factor, which addresses the "nature" of the copyrighted work, "recognizes that creative works are 'closer to the core of intended copyright protection' than informational and functional works, 'with the consequence that fair use is more difficult to establish when the former works are copied.'" *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1402 (9th Cir. 1997) (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 586 (1994)).

The Copyright Act accommodates the First Amendment by limiting copyright's scope to creative and original expression. Doing so gives latitude for the public to openly use underlying ideas and concepts and prevents others from locking up otherwise unprotectable material from further reuse. As the Supreme Court explained, "First Amendment protections [are] . . . embodied in the Copyright Act's distinction between copyrightable expression and uncopyrightable facts and ideas, and the latitude for scholarship and comment traditionally afforded by fair use." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 560 (1985). These same free expression policy objectives are integral to "the constitutional purpose of copyright law [which is] 'to promote the Progress of Science and the useful Arts' by securing to 'authors the right to their original expression, but encourag[ing] others to build freely upon the ideas and information conveyed by a work.'" *ABS Ent., Inc. v. CBS Corp.*, 908 F.3d 405, 414 (9th Cir.

2018) (quoting *Feist Pubs., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 349–50 (1991)).

Setting aside the issue of whether the photographs at issue—essentially, precise reproductions of the underlying Picasso paintings—would be protectable under U.S. law, *Sicre de Fontbrune v. Wofsy*, 39 F.4th 1214, 1226 n.10 (9th Cir. 2022), the panel should have considered the creativity of these photographs (that is, the extent to which they added any protectable expression beyond that in the Picasso works themselves) more thoroughly as part of its fair use assessment. The amount of creative expression in a work, as opposed to documentary facts or other non-copyrightable material, informs the second fair use factor. *Am. Soc. for Testing & Materials v. Public.Resource.Org, Inc.*, 896 F.3d 437, 451-52 (D.C. Cir. 2018). Here, the panel failed to meaningful assess their creativity; nor did it explore or balance the significance of the second factor "in light of the purposes of copyright" or its First Amendment implications. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994). The panel merely recited that "photos are generally viewed as creative, aesthetic expressions[,]" *Wofsy*, 39 F.4th at 1125 (quoting *Monge v. Maya Magazines, Inc.*, 668 F.3d 1164, 1177 (9th Cir. 2012)), and then accepted without question the judgment of the French court that the photos have "creative elements." *Wofsy*, 39 F.4th at 1125.

8

While some photographs can be highly original and creative, *see McGucken v. Pub Ocean Ltd.*, No. 21-55854, 2022 WL 3051019, slip op. at 8 (9th Cir. 2022), photographs are not necessarily creative. They may be, like those at issue here, mere photographic reproductions of their underlying works, lacking the requisite creativity for copyright protection. *Bridgeman Art Lib., Ltd. v. Corel Corp.*, 36 F. Supp. 2d 191, 196 (S.D.N.Y. 1999) (no copyright in photographs of public domain art when photographs showed no "distinguishable variation"). In situations where copyright is "thin," or far from the "core of copyright," *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1202 (2021), the second factor can substantially affect whether the work is subject to fair use.

In this case, the record shows no evidence that the district court or the panel ever even looked at the photographs as issue. If the panel had fully evaluated the Zervos Photographs as the fair use analysis requires, especially in light of decisions on minimum standards of creativity for a copyrighted work in this and almost every other circuit, it more seriously would have assessed the implications of restricting Wofsy's use of those photographs, which simply document Picasso's works. *See ABS Ent. Inc.*, 908 F.3d at 423 (no copyrightable creative addition in remastered sound recordings); *ATC Distrib. Grp., Inc. v. Whatever It Takes Transmissions & Parts, Inc.*, 402 F.3d 700, 712 (6th Cir. 2005) (insufficient creativity for copyright protection in "hand-drawn sketches of transmissions parts,

9

copied from photographs cut out of competitors' catalogs"); *Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.*, 528 F.3d 1258, 1262 (10th Cir. 2008) (no copyright in wire-frame models of 3D cars).



*Picasso's Pierrot and Harlequin (1918) (left) original held by the Art Institute of Chicago,[3] (right) from the Zervos Catalogue.[4]*

The above shows just one example of the works at issue in this case: the Zervos image (right) demonstrates the lack of any copyrightable material added to Picasso's underlying work (depicted on the left) throughout the Zervos Catalogue. Had the panel probed further—or at least remanded to the district court for further proceedings to examine the images themselves—it would have recognized the lack

---

[3] Image obtained from the Art Institute of Chicago, *Pierrot and Harlequin,* https://www.artic.edu/artworks/61867/pierrot-and-harlequin.
[4] Christian Zervos, Pablo Picasso - Catalogues Raisonnés, Zervos #135, (Paris: Éditions Cahiers d'art, 1949, v. 3).

of creativity in these works and consequently found the second fair use factor to weigh strongly in favor of Wofsy.

### B. The Court Failed to Consider First Amendment Principles When Assessing the Purpose and Character of the Appellee's Use

The panel also erred when it determined that the first factor weighed against fair use because Wofsy's reproduction of the works of The Picasso Project (which, again, are not Picasso's works but photographs of Picasso's works) was commercial and non-transformative. In arriving at this conclusion, the panel neither followed the direction of the Supreme Court, nor adhered to the kind of detailed approach previously employed by this Court to assess the "purpose and character of the use."

First, the panel rejected the district court's finding that Wofsy's use "aligned with criticism, comment, news reporting, teaching . . . , scholarship, or research," and instead oversimplified Wofsy's as "the reproduction of copyrighted photographs in a book offered for sale." *Wofsy*, 39 F.4th at 1124. The panel's surface-level analysis mirrors the approach to transformative use that the Supreme Court explicitly rejected in *Google LLC*, 141 S. Ct. at 1203:

> Google copied portions of the Sun Java API precisely, and it did so in part for the same reason that Sun created those portions, namely, to enable programmers to call up implementing programs that would accomplish particular tasks. But since virtually any unauthorized use of a copyrighted computer program (say, for teaching or research) would do the same, to stop here would severely limit the scope of fair use.

The same is true here. While Wofsy copied the Zervos Photographs "precisely" for the same reason that they were created—for use in a book offered for sale—at that high level of abstraction, virtually any unauthorized use of third-party images in a book offered for sale would fail this version of the factor one analysis. A court may not "stop here," as a more thorough analysis is needed to avoid "limit[ing] the scope of fair use." *Id*. The panel's approach would radically alter commonly accepted understandings of how fair use applies to nonfiction publishing and would upend that market, which relies heavily on fair use to incorporate images in "books offered [for] sale," *Wofsy*, 39 F.4th at 1124, for scholarly purposes. *See, e.g.*, COLLEGE ART ASSOCIATION, CODE OF BEST PRACTICES IN FAIR USE FOR THE VISUAL ARTS 9 (2015), https://www.collegeart.org/pdf/fair-use/best-practices-fair-use-visual-arts.pdf (fair use of images in analytical writing).

On the question of transformativeness, the panel should have followed the Supreme Court's guidance: "in determining whether a use is 'transformative,' we must go further and examine the copying's more specifically described 'purpose[s]' and 'character.'" *Google LLC*, 141 S. Ct. at 1203 (quoting 17 U.S.C. § 107(1)). This consideration often requires examining how the secondary work will be used by others. *Id*. Yet here, the panel dismissed the need to evaluate how Wofsy's work was intended to be used, citing no Ninth Circuit law, and instead only two Sixth Circuit cases on copyright infringement by commercial

intermediaries for the proposition that "the 'end-user's utilization of the product is largely irrelevant," *Wofsy*, 39 F.4th at 1124 (citing *Zomba Enters., Inc., v. Panorama Recs., Inc.*, 491 F.3d 574 (6th Cir. 2007) and *Princeton Univ. Press v. Mich. Document Servs., Inc*., 99 F.3d 1381 (6th Cir. 1996)).

Proper evaluation of the purpose and character of use commonly requires consideration of end users, as well as the broader public benefit of the use. *See Sega Enters. Ltd. v. Accolade, Inc*., 977 F.2d 1510, 1523 (9th Cir. 1992) (considering public benefit). In *Kelly v. Arriba Soft Corp*., 336 F.3d 811, 818 (9th Cir. 2003), for example, this Court held that Arriba's image search engine functionality was transformative because it used the images not for their aesthetic purpose, but as part of a tool to help users find and retrieve those images online, ultimately benefiting the public. In *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007), this Court similarly concluded that Google's use of underlying images for a search engine was "highly transformative" because it allowed users to search for and identify those images. Similarly, in *Google*, the Supreme Court held that Google's use of Oracle's Sun Java API to create the mobile operating system Android was transformative in large part because of how it would be used by end-users (in that case, programmers). *Google LLC*, 141 S. Ct. at 1203 (finding the use of Oracle's code to "create a new platform that could be readily used by programmers" to be highly transformative).

In this case, had the panel fully assessed the purpose and character of Wofsy's use, including evaluating its scholarly and research value to users, it would have recognized that use as highly transformative. The Picasso Project was created to offer users a "systematic and comprehensive illustrated record of Picasso's paintings," far more complete than earlier catalogs including the Zervos Catalogue itself. HERSCHEL CHIPP & ALAN WOFSY, PICASSO'S PAINTINGS, WATERCOLORS, DRAWINGS AND SCULPTURE : A COMPREHENSIVE ILLUSTRATED CATALOGUE, 1885-1973 : THE PICASSO PROJECT (Alan Wofsy Fine Arts, 1995) (v. 1, From Cubism to Neoclassicism). Indeed, unlike the Zervos Catalogue, The Picasso Project contains substantial cross-references to aid scholars in finding other catalogs that include each image and where each underlying Picasso original may be found. Thus, end users rely on The Picasso Project for new and different purposes than the Zervos Catalogue, which merely reproduced a fraction of Picasso's works. Just as in *Perfect 10*, "though an image may have been created originally to serve an entertainment, aesthetic, or informative function," The Picasso Project "transforms the image into a pointer directing a user to a source of information." *Perfect 10, Inc.*, 508 F.3d at 1165. And just as this Court observed in that case that "a search engine provides social benefit by incorporating an original work into a new work, namely, an electronic reference tool," *id.*, this work takes the more traditional

14

route—offering social benefit by incorporating the work into a book that serves as a valuable reference tool.

### C. Fair Use Analysis Provides a Pivotal Safeguard for Protected Speech Against Foreign Copyright Judgments Repugnant to U.S. Public Policy.

The panel's errors in its fair use analysis demonstrate the critical role the fair use doctrine plays in preserving the constitutional balance of copyright protection and First Amendment rights, including against foreign copyright judgments. *See S.A.R.L. Louis Feraud Int'l v. Viewfinder, Inc.*, 489 F.3d 474, 479 (2d Cir. 2007). However, by considering the nature of the copyrighted work as part of the fair use defense, U.S. courts can ensure that foreign copyright judgments do not prevent U.S. authors or members of the public from engaging in protected speech using third-party works. Likewise, by considering end users and public benefit under the first fair use factor, U.S. courts can ensure that foreign copyright judgments do not undermine U.S. copyright policy aimed at providing "latitude for scholarship and comment." *Golan*, 565 U.S. at 328. The panel should have given these considerations significantly more time and attention. Enforcing foreign copyright judgments without first conducting a complete analysis of an asserted fair use defense risks curtailing the First Amendment rights of U.S. authors and members of the public and upsetting the constitutional balance of limited copyright protection.

15

## CONCLUSION

Given the importance of fair use and free expression to U.S. public policy, and the broad and negative implications of leaving the panel's decision in place and maintaining a foreign judgment repugnant to U.S. public policy, combined with the significant errors that the panel made in its current ruling, we respectfully urge the Court to accept the petition for rehearing.

*(Signature page follows)*

Dated: August 22, 2022                    Respectfully Submitted,


                                          */s/ Kathryn Thornton*
                                          Kathryn C. Thornton (*counsel of record*)
                                          **ROPES & GRAY LLP**
                                          2099 Pennsylvania Avenue NW
                                          Washington, D.C. 20006
                                          (202) 508-4600
                                          kathryn.thornton@ropesgray.com

                                          James R. Batchelder
                                          **ROPES & GRAY LLP**
                                          1900 University Avenue, 6th Floor
                                          East Palo Alto, CA 94303
                                          (650) 617-4000

                                          Evan Gourvitz
                                          **ROPES & GRAY LLP**
                                          21211 Avenue of the Americas
                                          New York, N.Y. 10036

                                          David Hansen
                                          Rachel Brooke
                                          **AUTHORS ALLIANCE**
                                          2705 Webster St., #5805
                                          Berkeley, CA 94705

                                          Corynne McSherry
                                          Mitchell Stoltz
                                          **ELECTRONIC FRONTIER FOUNDATION**
                                          815 Eddy Street
                                          San Francisco, CA 94109
                                          (415) 436-9333

                                          John Bergmayer
                                          **PUBLIC KNOWLEDGE**
                                          1818 N Street NW, Suite 410
                                          Washington, D.C. 20036
                                          (202) 861-0020


                                          *Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 29, I certify that:

This brief complies with the type-volume limitation of Circuit Rule 29-2(c)(2) because this brief contains 3,563 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word 2016 Times New Roman 14-point font.


Date: August 22, 2022                    Ropes & Gray LLP


                                        */s/ Kathryn Thornton*
                                        Kathryn Thornton

                                        *Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on August 22, 2022.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Ropes & Gray LLP


*/s/ Kathryn Thornton*
Kathryn Thornton

*Counsel for Amici Curiae*